No. 34,936

E. F. Davis, *Appellee*, v. H. D. Julian, *Appellant*.

(107 P. 2d 745)

Opinion filed December 7, 1940.

*W. D. Jochems, J. Wirth Sargent, Emmet B. Blaes, Roetzel Jochems* and *Robert G. Braden,* all of Wichita, for the appellant.

*Oliver A. Witterman,* of Wichita, for the appellee.

The opinion of the court was delivered by

Wedell, J.: This was a workmen's compensation case. Claimant prevailed, and respondent has appealed.

The questions presented are, first, whether claimant was an employee of respondent, and second, whether respondent was subject to the provisions of the workmen's compensation act.

The sole issue on the first question is whether there was substantial evidence to support the finding that claimant was respondent's employee. Claimant testified in substance: He was a painter. He first became acquainted with respondent about three years ago when he did some painting work for respondent. The instant painting job, on which he was injured, was at 1123 Carlos street. He was employed by respondent. He was the only painter on the job. He first talked to respondent on a Thursday, and went to work the next day. Respondent operated a paint and wallpaper store, and contracted for painting and paper hanging. He advised respondent he charged sixty cents per hour. Respondent told him this job was worth seventy-five cents per hour if a man could work fast enough. Claim-

ant worked all day Friday, half a day Saturday, and until 3:30 in the afternoon on the following Monday, at which time a scaffold fell and he was injured. Respondent furnished one ladder, and claimant furnished the other. The rest of the equipment belonged to respondent. When claimant first talked to respondent he was informed respondent had another job about finished, and planned to bring his ladder from that job to finish the instant job. After claimant fell he called one of the carpenters and told him to notify respondent of the injury. Respondent came to the house, and claimant directed him to notify the Wichita hospital. At the hospital Dr. C. K. Wier was called. On the way home respondent told claimant not to worry about medical expenses, that they would be taken care of. Respondent then stated the job was financed through the building and loan association, and that there was $1,000 or $1,100 yet available on the job, and that he (respondent) was not going to sign any more checks until they had made arrangements to settle up with him.

On cross-examination claimant testified in substance: He did not recall having made any arrangements to take the instant job for a lump sum of $45. He fell from a plank on the top of two stepladders. One of the ladders gave way, and he fell across his own ladder and broke it. He went to respondent's store on the Saturday following the accident to draw some money for a day and a half's work. Respondent asked him how much he wanted, and claimant told him he would like to have all he had coming to him, $7.20.

On redirect examination claimant testified in substance: Exhibit A was the receipt he signed. It was given to him by respondent when he went to the store to get the balance of his money, $3.60, making a total of $10.80 for the entire time he had worked. He had previously been paid $7.20. The $3.60 was for the six hours which he worked on Monday at the rate of sixty cents per hour. To the best of his knowledge, respondent operated a paint and wallpaper store, and contracted jobs whenever respondent could get them. He did not know how many employees respondent had on October 30, nor during the month of October. The other workers on the job were carpenters who were working on a subcontract for one of their number.

Dr. C. K. Wier was the only other witness called by claimant. He was the doctor who was called when claimant was injured. Doctor Wier testified in substance: On the day of the injury Mr. Julian gave me a slip with the name of the property owner where the work

was being done, also the name of the real-estate company. He said that he was not liable and stated that there was a certain sum of money for this particular job, which would be able to take care of the doctor bill.

H. W. Aten was called as a witness on behalf of respondent and testified in substance: He was the original contractor on the job at 1123 Carlos. Respondent had the paint job. Respondent had the job of "painting my own home." In that particular deal there was a subcontractor under respondent. He did not know how claimant was hired on the instant job, but it was his understanding it was a lump sum to do the job. Respondent furnished the paint for the instant job. He (Aten) did not know anything about the labor.

Respondent's testimony concerning the exact arrangement with claimant at the time claimant was employed was very meager. His testimony concerning the employment of claimant was in substance as follows: He (respondent) operated a paint and wallpaper store. He did not remember claimant working for him before. When claimant first came and asked for work he was told there was a job which he (respondent) might get for him. Claimant was then told there was a $100 job, $55 was figured for material and $45 was figured for labor. Claimant stated he would take it, and would start work the next day.

Respondent testified concerning subsequent events in substance as follows: Claimant was in the store the next morning and wanted to borrow a long ladder. Respondent charged claimant $3.50 for a paint brush, and made the entry in his material book for the instant job. After claimant had worked a day and a half he wanted some money. Claimant was advised he had not completed much of the work, but claimant wanted $7.20, so that is what he paid him on Saturday night. The next time he saw claimant was after his injury. Respondent did not tell claimant the injury would be taken care of. Claimant was advised that respondent wanted to help him with the doctor bill because respondent felt sorry for him. Sometime later claimant handed him the receipt and inquired whether respondent would pay him more on what he had coming. When respondent asked him how much more, claimant said: "Give me $3.60 and I will call it square." Respondent inquired of claimant whether he would give him a receipt in full if respondent paid him that amount and claimant agreed to do so. Respondent then signed the receipt with the endorsement, "Paid in full for the job." (The receipt itself

was on an order blank of H. D. Julian Paint & Wall Paper Co., and contained the following endorsement: "Received of H. D. Julian $10.80 payment in full for all labor at 1123 Carlos," and was signed by E. F. Davis.)

Respondent's testimony was further in substance as follows: He had operated a paint store for about eight years. Years ago he contracted altogether, but when the social security act went into effect he made no profit on the labor, and confined his business to materials alone. The local social security office had informed him he was not required to pay social security taxes. He had explained to claimant the job was an insurance or loan job, and that it would be paid when it was finished; since claimant needed money he told him he would make him a loan or get some money for him.

On cross-examination respondent testified in substance: He was in the business of selling paint and wallpaper, but he did not paint houses. He took contracts to furnish material and he got the men to do the work just as any other store did. Claimant took the job at $45 for labor. It was about an eight- or ten-day job. The materials figured around $55 and he was to furnish them. Claimant would not have obtained the job if he had not used respondent's materials. The paint was to come from respondent's place, and he didn't care anything about the labor, since he didn't make a dime on it. If claimant had switched to somebody else's paint he would not have been paid for the whole job. He had no power to direct claimant to another job before this job was completed. That was up to claimant and Mrs. Oster, since it was her house. He had a dozen painting contractors working for him out of his store. When claimant first came to his office for pay he (respondent) did not figure any hours, but simply asked claimant how much he wanted. Claimant said he had done sufficient work to entitle him to $7.20, which respondent paid him. Claimant arrived at the figure himself. Respondent figured claimant had that much coming on a $45 deal, if he had completed as much work as he said he had. He would have been paid any reasonable amount if claimant was not drawing too much from the job. That is the manner in which he carried on his business with all the painters. Although he told claimant he didn't have anything coming since he hadn't finished the job, he gave him $10.80 in return for a receipt in full. He made the estimate for Aten on this job and contracted to furnish the paint. He figured the labor and material for a total of $100. The owner of the building

did not come to him for any particular results, but went to Mr. Aten, the general contractor. He let the paint job to claimant, and if any of the work was unsatisfactory, complaints would have been made to Aten. Complaints on material would have come to him. Aten wanted me to send out a painter so he would know how much to figure for labor. This was a building and loan job, and he had nothing to do with the procuring of the loan. The only money he received was for the paint. He had no interest in the property. He could not have filed claim. He could have paid him the $45 and then fired claimant, and conversely claimant was not entitled to any of the $45 when he quit before the contract was finished. Claimant was broke and I paid him $10.80 on the job, which is the amount he requested.

On redirect examination respondent testified in substance: He made no inspection of claimant's work—that was Mr. Aten's responsibility. He did not advance credit to painters; he advised them to get it from the owner, but when respondent knew the owner would pay he would allow the painters credit. After claimant was injured he (respondent) made a contract with Mr. Grossman to finish the job at $32 for the labor.

On recross-examination respondent testified in substance: He billed Mr. Aten for the paint. Although the loan had not yet come through and Mr. Aten had not yet paid him, he (respondent) advanced $10.80 to claimant out of his own pocket.

Mrs. Anna S. Arnold, called as a witness for respondent, testified in substance as follows: She worked for respondent and was present the day claimant first came to see respondent. She heard respondent tell claimant *that respondent had a house to paint* on which job $45 was allowed for labor, and that claimant stated that was agreeable to him, but he didn't have his equipment there and would start the next day. She next saw claimant when he came to draw some money on that week-end. Claimant stated he needed some money. Respondent inquired how much work he had done and how much he needed. Claimant said $7.20 or $7.80. Respondent paid him that and told him to apply it on the contract.

On cross-examination Mrs. Anna S. Arnold testified in substance: She sold paint and wallpaper and kept the records and books for respondent. Claimant said he needed some money to run him over the week-end, and that he had two or three sides painted. Nothing was said about the number of hours he had worked.

Roy Grossman, a witness for respondent, testified in substance: He has worked for respondent six or seven years and finished the instant job. Respondent showed him the job and told him how much money *he had in it to pay for labor* and he took the job for $32.

On cross-examination Grossman testified, in substance: He had never worked for respondent on the basis of an hourly rate and he had probably ten jobs that summer. It required about eight days to finish this job. The scaffold board was available to all men who worked out of respondent's store. The $32 for which he contracted included only labor.

In reply to the testimony of respondent, concerning claimant's arrangement with respondent, and respondent's right to hire and discharge painters, claimant testified on rebuttal as follows:

"I had a conversation with Mr. Julian on the Saturday preceding the Monday I was hurt. I said I would like to get some money and he said, 'How much?' I said, 'I would like to get what I have coming, $7.20.' He paid me that and said, 'I don't know how long you can work out there on that job at sixty cents an hour, you know I can hire plenty of men for fifty cents, and it depends on how much surface you cover as to whether you finish the job there.' Mr. Julian made out this receipt, exhibit A, before I got down to the store. I asked him to put some hours on it and he said that it would be all right, but he didn't do it.

"Mr. Julian said that the future of the job, as far as I was concerned, depended on how much I got done. If I couldn't cover enough surface at sixty cents he was going to hire somebody for fifty cents. I asked him to put the hours on the receipt, but that wasn't the same day."

Was claimant respondent's employee? The trial court, by a specific finding, answered that question in the affirmative. The issue on appeal is not whether there was testimony to the contrary, but whether there was substantial testimony to support that finding. (*Walker v. Finney County Water Users Ass'n*, 150 Kan. 254, 257, 92 P. 2d 11.) If so, that issue is settled.

In this case we may first well inquire whether respondent was liable to claimant for the services claimant had rendered. Claimant did not contract with the owner of the building, with some building and loan association or with some real-estate concern which, so far as the record discloses, were strangers to his employment. There was no testimony any of them had employed claimant or that they even knew he was to do the painting. Claimant did not contract with Mr. Aten, the original contractor. He did not even see Mr. Aten concerning the work. Mr. Aten testified, "I was the original

contractor and Mr. Julian had the paint job." He also testified, "I don't know anything about the labor." All he knew was what he had understood from somebody who was not the claimant. Who then, other than respondent, did employ claimant? No one. So far as claimant knew, who was to pay for his services? The respondent. Who did pay for his services? The respondent. At what rate per hour was claimant actually paid? He was paid at sixty cents per hour. Respondent had told him the job was worth seventy-five cents per hour if claimant worked fast enough. Who was to decide whether he worked fast enough? There was positive evidence respondent clearly intimated to claimant that he, respondent, had authority to determine that fact. Claimant's testimony was that respondent told him, "I don't know how long you can work out there on that job at sixty cents an hour, you know *I can hire* plenty of men for fifty cents, and it depends upon how much surface you cover as to whether you finish the job there." (Emphasis supplied.) That statement, according to claimant, was made after claimant had received his first payment from respondent in the sum of $7.20.

Was there any other testimony which indicated, or tended to indicate, that respondent had control over claimant's work and authority to discharge him? Claimant testified: "Mr. Julian said that the future of the job, as far as I was concerned, depended on how much I got done. If I couldn't cover enough surface at sixty cents an hour *he was going to hire somebody for fifty cents.*" (Emphasis supplied.)

Respondent insists the contract *he made* with claimant was for a completed job at $45. That is in itself a clear indication as to who made the contract with claimant. Let us, however, pursue the subject a little further. When claimant's services were terminated by reason of injury, who assumed responsibility for getting the job completed? Did respondent leave that alleged responsibility to claimant? Did respondent insist that claimant hire another painter to finish this (claimant's) contract for a completed job? Not at all. Claimant was not even consulted concerning the completion of the job. Roy Grossman, who completed the job, testified: "Mr. Julian showed me the job and told me how much money *he had in it* to pay for the labor and I took it for $32." (Emphasis supplied.) This testimony rather clearly indicated that respondent was selling not only paint, but was also responsible for the employment of labor— the entire painting job. It corroborated the testimony of respond-

ent's own witness, the original contractor, who testified, "Mr. Julian had the paint job."

There is another bit of testimony which we cannot well ignore and which we assume the district court did not ignore. It is respondent's own testimony. He testified: "Mr. Davis (claimant) would not have obtained the job if he was not going to use my materials. . . . If he had switched to somebody else's paint he wouldn't have been paid for the whole job." That testimony clearly indicated that a definite relationship existed between the sale of respondent's paint and the employment of workmen who were to do the painting. Obviously, under some arrangement which respondent had with others, respondent had the entire painting job. The laborer could not get the job unless he used respondent's paints. On the other hand, if a laborer obtained the job and discontinued the use of respondent's paints he would not have been paid for the entire job. In view of the entire record, we have no hesitancy in concluding there was ample testimony to support the finding that claimant was respondent's employee, and that claimant was not an independent contractor. (*Pottorff v. Mining Co.*, 86 Kan. 774, 122 Pac. 120; *Mendel v. Fort Scott Hydraulic Cement Co.*, 147 Kan. 719, 723, 78 P. 2d 868; *Dobson v. Baxter Chat Co.*, 148 Kan. 750, 754, 85 P. 2d 1.)

It is not the actual exercise of direction, supervision or control over a workman which determines whether he is a servant or an independent contractor, but the right to exercise such direction, supervision or control. (*Mendel v. Fort Scott Hydraulic Cement Co.; Dobson v. Baxter Chat Co.*, supra, and cases therein cited.) In the instant case respondent not only had exclusive control over the materials which claimant put into the job, but he exercised that control. Respondent, also, according to his own testimony, had control over the hourly wages and the speed at which claimant worked. Respondent had authority to discharge claimant. That right is a distinct incident in the relationship of employer and employee. (*McKinstry v. Coal Co.*, 116 Kan. 192, 225 Pac. 743, 38 A. L. R. 837; *Mendel v. Fort Scott Hydraulic Cement Co.; Dobson v. Baxter Chat Co.*, supra.) There was evidence claimant was paid wages. He was paid at the rate of sixty cents per hour. The fact he was paid wages tended to establish the relationship of employer and employee. (*McKinstry v. Coal Co.*, supra.) It is true respondent testified he told claimant he might get a job for him on

which the labor estimate was $45. It is also true, however, that there was strong evidence the paint job was respondent's, and that the respondent had the right, if not in fact the positive duty, to supervise and control it.

Respondent finally contends the injury must occur in the employers' trade or business and that painting houses was not his trade or business. The general principle that the injury must occur in the employer's trade or business is, of course, well established. (*Lehman v. Grace Oil Co.*, 151 Kan. 145, 98 P. 2d 430, and cases therein cited.)

Was respondent, however, engaged only in the trade or business of selling paint? The answer must be in the negative. It is unnecessary to review the evidence previously narrated. It discloses respondent had probably a dozen other painting jobs in progress for which he furnished the material and provided the labor under the same, or similar, arrangement. That was the manner in which he conducted his business. Clearly, the evidence was sufficient to establish the fact that respondent was engaged in the trade or business of painting houses. (*Shrout v. Lewis*, 147 Kan. 592, 77 P. 2d 973.)

It may be true that respondent made no profit on the labor and that for this reason the local administrator of the social security law relieved him from the payment of the tax under that law. The question of proper interpretation or administration of that law is not an issue in this lawsuit. We are here required to interpret our own workmen's compensation law. Profit in the employer's trade or business, or some part thereof, is not made a condition precedent to liability for compensation under our compensation law.

It is true respondent could have engaged solely in the business of retailing paints. Had he done so his business would not have been subject to the provisions of the compensation act. He did not, however, so restrict his trade or business. He undertook painting jobs as a regular part of his trade or business. The sale of paint was one of the incidents of that trade or business. Another incident of his trade or business, as he conducted it, was the employment of painters. Both were necessary incidents to the prosecution of the trade or business in which respondent was in fact engaged. That being true, respondent was liable for compensation, if the trade or business of painting houses is within the compensation act. (*Purkable v. Greenland Oil Co.*, 122 Kan. 720, 724, 253 Pac. 219; *Lehman v. Grace Oil Co.*, supra.) In the Lehman case we held:

"In order to render a person liable as a principal for compensation to a workman under G. S. 1935, 44-503 (a), it is necessary that the principal shall have undertaken to execute work which is a part of his trade or business or that he shall have contracted to perform work for another." (Syl. ¶ 2.)

Is the painting of buildings within the act? The act specifically includes the decoration of any building or structural appurtenances, within the classification of "building work," and that business is included within the act irrespective of the number of workmen employed or the period of their employment. (G. S. 1935, 44-507, 44-508 [f]; *Setter v. Wilson*, 140 Kan. 447, 37 P. 2d 50; *Shrout v. Lewis*, 147 Kan. 592, 594, 77 P. 2d 973.)

The judgment is affirmed.