No. 36,600

WALTER PALMER, *Appellee*, v. H. D. JULIAN, doing business as Julian Paint and Wallpaper Company, *Appellant*.

(170 P. 2d 813)

Opinion filed July 6, 1946.

*W. D. Jochems* and *Joe T. Rogers,* both of Wichita, argued the cause, and *Wirth Sargent* and *Roy L. Rogers,* both of Wichita, were on the briefs for the appellant.

*Paul R. Kitch,* of Wichita, argued the cause, and *Howard T. Fleeson, Homer V. Gooing, Wayne Coulson, Manford Holly* and *Dale M. Stucky,* all of Wichita, were on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was a common law action founded on negligence, to recover damages for personal injuries. The case is here upon appeal by the defendant from orders overruling his demurrer to the plaintiff's evidence and his motion for a directed verdict at the close of all the evidence.

The order overruling the motion for a directed verdict requires no discussion. Such an order is not appealable. It is not a final order since it does not determine the cause. Nor is it specifically made appealable by statute, as is a ruling on demurrer, whether the demurrer is sustained or overruled. (G. S. 1935, 60-3302, *Second,* last phrase; *Commander-Larabee Milling Co. v. McBride,* 152 Kan. 709, 107 P. 2d 668.)

In his petition, the plaintiff Palmer alleged that he was employed by defendant Julian, who was doing business as the Julian Paint and Wallpaper Company, to perform services for him in painting and decorating the interior of a business house operated by one Mosley in the city of Wichita; that the defendant Julian was "engaged in the decoration of buildings and structural appurtenances," and that in January, 1941, Julian had filed his written election not to come within the provisions of the Kansas workmen's compensation act; that for his services in doing the painting and decorating, Julian, the defendant, agreed to pay him $1.10 per hour and to furnish all necessary equipment; that in compliance with the contract he and a coemployee Cox started work on April 15, 1944, at about 4:30 in the afternoon, and continued on the job until the

accident later referred to occurred; that they were required to work at a height of about eight feet from the floor and in doing so were standing upon a long plank which was placed upon stepladders at that height; that all the equipment had been furnished by the defendant; that one of the stepladders furnished by the defendant was defective, that a crosspiece thereon was broken, which defect weakened it and made it susceptible to toppling or to being overturned, which fact was known by the defendant or in the exercise of reasonable and ordinary care should have been known to him; that while the other workman, Cox, was standing on the plank over the defective ladder, the ladder gave way and without notice or prior warning he, the plaintiff, was thrown to the floor and suffered very serious injuries. It was alleged in the petition that plaintiff's injuries resulted from the negligent acts of the defendant in providing a stepladder which had a broken crosspiece and which he knew or should have known might topple or overturn when direct or slight side pressure was exerted thereto at the height at which the employees were required to work; in failing to inspect, properly test and to repair said ladder in a workmanlike manner prior to its being furnished for the use required; in failing to furnish stepladders free of defects which would withstand the direct and side pressure ordinarily exerted in painting operations at a height of approximately eight feet; in failing to furnish equipment reasonably fit for the purposes of the work.

In his answer the defendant admitted his occupation and that in January, 1941, he had filed his written election not to come within the provisions of the compensation law, but further alleged that he was engaged only in the business of buying and selling paint and wallpaper and was not engaged in any business or occupation coming within the provisions of the workmen's compensation act. Defendant further alleged that it was common practice in Wichita for painters who desired employment at their trade to go to the paint stores and make inquiry as to any painting jobs available; that the plaintiff came to his place and made such inquiry about the 14th day of April, 1944, and was informed that a paint job was to be done at the business place operated by Mosley and that Mosley would pay for the work and that he, the defendant, would furnish the paint. Other pertinent allegations of the answer may be summarized as follows: That the plaintiff and Cox went to the place where the painting was to be done and they returned to defendant's

store and informed him that they had no ladder suitable to do the work, and defendant suggested that he had a couple of ladders and a plank which he would let plaintiff use, but that one of the ladders needed a slight repair, and that defendant and Cox repaired the ladder and plaintiff assisted in repairing it and that the defendant did not know the manner in which the workmen attempted to perform the work; that the stepladders obtained from him were the usual and ordinary kind of stepladders commonly used and were in good condition after the repair had been made and that he did not know of anything that could have been done to make them safer or in better condition than they were; that if said stepladder was ever defective in that a crosspiece thereon was broken, it was completely repaired before plaintiff and Cox began using it; that the ladders were no more susceptible to toppling and being turned over than any other ladders of like height and construction, and if they were, it was a fact known to plaintiff or by the exercise of ordinary care could have been ascertained by him; that there were no hidden defects in the ladders and plank and that they were ordinary simple tools commonly used by painters; that the plaintiff and Cox were men of mature age and had been in the business of painting and decorating for many years and were as capable of judging the condition of the stepladders as was defendant; that defendant was not present when the accident occurred, and that if the ladder was caused to topple and fall, it was because of the manner in which the workmen carried on their work and not because of any defect in the ladder; and that the injury was not caused by any act of negligence on the part of defendant, but if plaintiff suffered injury it was the result solely of his own negligence and carelessness and that of his coworkman. Defendant also alleged that if it should be determined that he was the employer at the time and place alleged, the work of plaintiff was not in the usual course of his trade or business.

We first take note of defendant's election not to come within the provisions of the workmen's compensation act. Section 44-544, G. S. 1935, provides:

"In any action to recover damages for a personal injury sustained within this state by an employee (entitled to come within the provisions of this act) while engaged in the line of his duty as such or for death resulting from personal injury so sustained, in which recovery is sought upon the ground of want of due care of the employer, or of any officer, agent or servant of the employer, where such employer is within the provisions hereof, it shall not be a defense to any employer (as herein in this act defined) who shall have elected, as here-

inbefore provided, not to come within the provisions of this act: (*a*) That the employee either expressly or impliedly assumed the risk of the hazard complained of. (*b*) That the injury or death was caused in whole or in part by the want of due care of a fellow servant. (*c*) That such employee was guilty of contributory negligence."

The general purpose of this section is obvious. It is to permit those whose trade or business automatically comes under the law to avoid the liabilities which the law imposes and to elect not to come within its provisions, upon the condition that they thereby lose the defense of assumption of risk by the employee, the defense of contributory negligence, and the defense that the injury was caused in whole or in part by the negligence of a fellow servant.

The business of painting and decorating is within the workmen's compensation act regardless of the number of employees. Section 44-505, G. S. 1935, provides in part:

"That this act shall apply only to employment in the course of the employer's trade or business in the following hazardous employments: . . . *building* or engineering work, . . . " (Italics supplied.)

Section 44-508, G. S. 1935, defines "building work" as follows:

"In this act, unless the context otherwise requires: . . . (*f*) '*Building work*' means any work in the erection, construction, extension, *decoration*, alteration, repair or demolition of any building or structural appurtenances. . . ." (Italics supplied.)

Under section 44-507, G. S. 1935, the act is made applicable to "building work":

". . . without regard to the number of workmen employed or the period of time employed."

(See, also, *Davis v. Julian*, 152 Kan. 749, 107 P. 2d 745.)

The appellant now says that he was not engaged in the business of painting and decorating, and the fact that in January, 1941, he filed an election not to come within the provisions of the compensation law constitutes no proof that he was engaged in painting and decorating at the time of the accident, and that in fact he had not contracted to do any painting and decorating since filing the election. On this point, correspondence introduced in evidence by the plaintiff is pertinent. In May, 1944, about three weeks after the accident, plaintiff addressed a letter to the defendant making a claim for compensation because of injuries received in the accident, and in reply to this letter, defendant stated through his attorneys that—

"Mr. Julian is not operating under the workmen's compensation act. He filed his election not to operate under that act on January 20, 1941, and im-

mediately thereafter posted notices to that effect in accordance with the requirements of the act.

"The claimant, Mr. Palmer, was not in the employ of Mr. Julian at the time of the accident.

"You are advised, therefore, that Mr. Julian denies any liability whatsoever in the premises."

It is thus clear that the defendant then asserted nonliability on two grounds only—first, because he had filed his election, and second, that the claimant was not his employee.

At about the same time that he wrote to the defendant, plaintiff filed a claim with the workmen's compensation commissioner and was advised by the commissioner under date of May 12, 1944, that the defendant had filed his election rejecting the Kansas workmen's compensation act on January 18, 1941; that such election was in full force and effect and that therefore he, the commissioner, had no jurisdiction to determine the matter.

Defendant could not consistently assert no liability because he had filed an election not to come under the compensation law and at the same time avoid the statutory consequences of filing such an election unless he could clearly show that subsequent to the filing of such election, he had discontinued carrying on any trade or business subject to the law, and was not engaged in such trade or business at the time of the accident.

The issue being here upon demurrer to plaintiff's evidence, we are interested only in the evidence which supports or tends to support plaintiff's cause. Three primary issues of fact were involved. First: Was the appellant at the time of the accident engaged in the business of painting and decorating? Second: Was the appellee in the employ of the appellant? Third: Did the appellant furnish appellee with defective equipment—with a stepladder that was not reasonably safe for the use for which it was intended? Although there was conflict of evidence, we find ample evidence to support a finding in the affirmative upon all three questions.

Palmer testified:

"Mr. Julian asked me if I would paint for him Saturday and Sunday. I told him I didn't want to; so he asked me again. Said he wanted me to paint Saturday night and Sunday. . . . Then I asked him what he was paying. He said a dollar an hour and I said I won't work for a dollar an hour; the scale was $1.25. So he said he would pay $1.10 and supply all the material. So I said 'all right.'"

"Q. Was there anything said about where you were to work? A. No, sir.

"Q. You did not know where you were to work? A. Never knew. No, sir.

"Q. And you never made any inquiry? A. No, sir."

He testified further that on Saturday he returned to Julian's place and Julian then told him the place where he was to work.

Mosley testified:

"I acquired the Rendevous on March 26, 1944. The nature of the business conducted in the Rendevous was the sale of food and soft drinks. . . . On the 15th day of April, 1944, the Rendevous was being redecorated. *Prior to the 15th day of April, 1944, I never at any time had a conversation with one J. L. Cox or one Walter Palmer relative to their doing work at the Rendevous. I did have a conversation with Mr. Julian.* This conversation took place in the Rendevous I believe on the Friday before the accident. I had telephoned Mr. Julian and told him that I had two bids to redecorate the place and *I asked him if he would come over and make a bid.* Following the telephone call he came to my place of business sometime during the Friday before the accident. I told him that I wanted a one-coat job on the inside, ceiling and walls. *Mr. Julian measured the place and told me that he would do the job for $160.00. I told him to go ahead and do it.* I told him I wanted the work started at least Saturday night or Sunday." (Italics supplied.)

At the time of the accident, Palmer was standing on the plank near the end where it rested on one of the steps of the ladder that was "practically new" and "in good condition." His fellow-workman, Cox, was standing near the other end of the plank where it rested upon the old ladder. Cox, called as a witness for the defendant, testified:

"Q. What took place there? Can you describe it to the jury, how this thing happened and how the scaffolding fell? A. Well, I just felt the ladder give—move; and I realized it was going and I yells to 'look out' and I jumped. I jumped straight down and when I got turned around Mr. Palmer was laying on the floor hollering 'My God, get a doctor.' . . . I was working over the old ladder. I had my back to Mr. Palmer. I don't know how he was turned. I was engaged in painting overhead and he was too. . . . I was standing on the east end, painting next to the partition. It did not require me to reach out from the platform very far. . . . At the prior trial I testified as follows:

" 'Q. Can you tell—describe to the jury what you and Mr. Palmer were doing in the way of painting? A. We were painting on the ceiling, both reaching up. Mr. Palmer was trying to reach half way over the counter where the partition was; and I was practically reaching straight up and I felt my ladder move once and it settled down and directly it started again and I yelled 'look out' because I knew what was coming and I jumped and that is about all I could tell and I heard Palmer say 'My God, get me a doctor; my leg is broken.' "

There was a great deal of testimony concerning the defective condition of the ladder. Before taking it from Julian's place, Julian and Cox—according to Palmer's testimony— made some repairs on the ladder by nailing two boards on one of the crosspieces. After Palmer and Cox started to use the ladder, they found it to be wobbly and attempted to strengthen it by tying some ropes to keep the legs from slipping. Palmer testified:

"Q. Now, directing your attention to Plaintiff's Exhibit 2, is this, to the best of your recollection, the older of the two ladders which was being used down there? A. Yes, sir.

"Q. Did you, at my request, before we convened this afternoon, examine this ladder? Did you, I say, examine it? A. Yes, sir.

"Q. Did you find that this ladder is still in approximately the same condition that it was in at the time of the accident? A. I see it has been tightened up or something.

"Q. What was the condition of that ladder on the evening in question in reference to its present condition? A. Everything was loose on it. . . . After we tied the rope on the ladder I couldn't tell whether it helped any because I was on the other end of the plank which was over the new ladder. Mr. Cox didn't say anything until it went over. After we attempted to stabilize the ladder we got back on the scaffolding and I was painting directly overhead when suddenly Mr. Cox hollered 'Look out' and I looked down from where I was painting and he was already jumping. I tried to jump but the other ladder had gone over throwing my ladder and the plank went down from under me. We were both painting right overhead when the ladder went over. . . . The ladder was loose and wobbly on the day of the accident."

Witness Graham, after being qualified as a witness—having been in the business of selling paint and paint supplies and in doing painting and paper contracting—testified after examination of the ladder that it was in an unsafe condition. He further testified:

"Q. Would the ordinary prudent painting contractor—would he or would he not—discard a ladder such as that as being obsolete? A. *I would say that would be discarded as unfit.* . . . I examined the ladder which is plaintiff's Exhibit 2, and as a result of my examination *I formed an opinion that the ladder was in an unsafe condition. The ordinary prudent painting contractor would have discarded the ladder as being unfit.* . . . The type of scaffolding being used is used by a great many painters around Wichita, *but not with that sort of a ladder."* (Italics supplied.)

Appellant stresses the proposition that while section 44-544 renders certain defenses unavailable to an employer who has filed an election not to come within the provisions of the act, the burden still remains upon the plaintiff to show negligence upon the part of the employer. We agree as to that. But, as already indicated,

there was substantial evidence that the stepladder was in a defective condition and that an ordinarily prudent painting contractor would have discarded it as unfit.

It is the duty of a master to furnish his servant with safe and suitable tools and equipment with which to work. Appellant does not question that long-established rule, but he says that a stepladder is a "common tool," and that the appellee was as familiar with ladders and knew as much as did the employer about the condition of the ladder, and that, therefore, it cannot be said that there was any actionable negligence upon the part of the employer. To adopt this view would be to restore to an employer who had elected not to come within the workmen's compensation act, the defense of assumption of risk by the employee. This would nullify the plain intent of the statute.

The obligation of an employer to furnish safe and proper tools was reasserted in the recent case of *Fishburn v. International Harvester Co.*, 157 Kan. 43, 138 P. 2d 471, in which our own cases as well as others were extensively reviewed. There is no need to go over the same ground here. In that case the plaintiff, as here, sought recovery for personal injuries in a common-law action for damages. The defendant had elected, as here, not to come within the provisions of the compensation act. The workman was lightly tapping the head of a bolt with a hammer furnished by the defendant when a small fragment of metal flew off the hammer and struck him in the eye. Although it was found unnecessary in that case, for reasons appearing in the opinion, to determine the effect of section 44-544, it was held that the fact that the defective tools are "simple tools" does not necessarily bar the servant from maintaining an action against the master upon the theory that the latter was guilty of negligence in furnishing them. (Syl. ¶ 4.) The facts and circumstances of the particular case must be considered. The fact that the defective tools are "common tools" may have a vital bearing upon the question of "assumption of risk," but in the case before us, the employer elected to forfeit that defense by filing the election.

Appellant contends, however, that even though he contracted to do the painting job, the making of this one contract did not put him under the compensation act and that therefore his filed election, even if still in effect, has no significance. The contention is based upon the proposition that appellant's principal business was

the sale of paint and other supplies, and that before he could be liable under the act "his activities in painting and papering must have . . . consumed a substantial portion of his time and capital." The two principal cases cited by appellant upon this point are *Setter v. Wilson*, 140 Kan. 447, 37 P. 2d 50, and *Martin v. Craig*, 148 Kan. 882, 84 P. 2d 853. Both were cases in which the owners of buildings had employed men to make repairs to their own properties. In the Setter case, the respondent owned a single store building and hired a workman to make repairs. We held that the mere owning of a house and keeping it in repair was not sufficient to constitute a trade or business, under the act. In the Martin case, the respondents owned several properties and employed workmen to put shingles on two houses. It was held that under all the facts shown, the respondents were not in the business of repairing buildings, and were not under the act.

The question is not here presented as to whether by extensive ownership and maintenance of his own rental properties, such owner may not be said to be engaged in "building work" or other trade or business covered by the workmen's compensation act. (See *Shrout v. Lewis*, 147 Kan. 592, 77 P. 2d 973.) In any event, there is a clear and obvious distinction between the case of an owner who hires someone to paint or repair or otherwise maintain his own property, and one who engages in the business of doing that sort of work. In the first case a property owner pays to have the work done; in the second case a man engaged in the trade or business of doing such work for a profit, gets paid for doing it. This distinction must be kept in mind in any appraisal of what was said in the Setter and Martin cases about the amount of time, labor or capital devoted to the work by the respondents. To lay it down as a fixed rule that no employer who engages, for profit, in "building work" or other trade or business made subject, automatically, to the compensation act, is under the law until he has engaged extensively in such work, would lead to illogical results certainly not intended by the legislature. Suppose, for instance—to use an illustration suggested by the appellee— that instead of contracting to paint the interior of Mosley's business house, the appellant had contracted to redecorate the interior of the Lassen hotel in Wichita. Certainly it could not be said he would not be under the compensation act because that was the first, or only, job of the sort he had undertaken, or because he,

personally, gave only a small part of his time to looking after it. If appellant desired to engage in the painting business, two courses were open to him. He could remain under the compensation law, with both the liabilities and the protections which it would afford him, or, he could elect not to come under the law and be liable only for injuries caused by negligence, but with forfeiture of the defenses enumerated in section 44-544, G. S. 1935. He could not "have his cake and eat it, too."

It is pertinent to note, at this point, that under the workmen's compensation act as originally enacted, *no employers were automatically under the law.* The law was applicable only to *certain employers who elected to come within its provisions.* (Laws 1911, ch. 218, sec. 8.) In 1913 the law was amended (Laws 1913, ch. 216, sec. 7), to provide that certain employers were automatically under its provisions unless they filed an election *not* to be under the act. Such a provision—with certain modifications not here material—has since remained in the law. (G. S. 1935, 44-542.)

At least as far as his employees on that job were concerned, appellant was engaged in the trade or business of painting when he made the contract with Mosley for a fixed price and hired them to do the work. Accordingly, he was then automatically under the workmen's compensation act, except to the extent that the filing of the election took him out from under its provisions. He did not defend this action on the ground that he was under the act and that therefore a common law action for damages would not lie. On the contrary, he declared that he was not under the act generally because he had filed the election. It follows that he cannot now avoid the consequences of section 44-544.

In support of their contentions, diligent and able counsel for the appellant call our attention to a number of our decisions. All have been examined but it would unduly extend this opinion to discuss all of them. Of those which are in point, most are readily distinguishable from the case before us. We make brief reference to a few of them.

*Byland v. Powder Co.,* 93 Kan. 288, 144 Pac. 251, L. R. A. 1915F 1000. Action was for injury resulting from powder explosion. Held, that the plaintiff failed to prove that his injuries resulted from failure of the defendant to comply with the Factory Act or that such failure directly contributed to the injury.

*Tramel v. Packing Co.*, 88 Kan. 730, 129 Pac. 1174. A workman in a packing house was injured when a stepladder upon which he was working slipped and fell. Held, that under the facts shown the defendant was not negligent in failing to equip the ladder with spikes to keep it from slipping. There was no contention that the ladder was otherwise defective. The workmen's compensation act was not pleaded, and the general rule as to cases of "common tools" was held to be applicable.

*Gillaspie v. Iron-works Co.*, 76 Kan. 70, 90 Pac. 760. This case was decided before enactment of the workmen's compensation act and therefore is not in point. The same is to be said of *Poneh v. Railroad Co.*, 83 Kan. 226, 109 Pac. 771.

*McCoy v. Atchison, T. & S. F. Rly. Co.*, 129 Kan. 781, 284 Pac. 417. Section 44-544 is not referred to in the opinion for the reason, doubtless, that the workmen's compensation act is not applicable to interstate commerce not subject to the legislative power of the state. (G. S. 1935, 44-506.)

*Wheeler v. Boyer*, 136 Kan. 648, 17 P. 2d 931, is not here applicable because the employer was a farmer not under the compensation act.

*Udey v. City of Winfield*, 97 Kan. 279, 155 Pac. 43. The plaintiff's husband, employed in the municipal light and water plant, was killed when a large pipe which he was attempting to disconnect fell upon him. It was alleged that the work was being done under orders of the foreman. It was held, first, that the evidence failed to show that the requisite number of persons were employed to bring the plant under the workmen's compensation act. The court then proceeded to treat the case as "an ordinary common-law action for damages," stating that the only question remaining was whether there was evidence "to show actionable negligence on the part of the city." Some statements which follow, in the opinion, may appear at first to support appellant's position here. But their inapplicability becomes apparent when it is remembered that the court had first held that the light and water plant was not automatically subject to the workmen's compensation act and had not elected to come under it. The accident took place in 1912, before the amendment of 1913 heretofore referred to. It is true that even under the law of 1911 then in effect, employers who did not elect to come under the act forfeited the defenses of assumption of risk and contributory negli-

gence. But the defendant city did not come within the class of employers to whom that provision applied. Accordingly, the case is not persuasive here.

The order overruling the demurrer is affirmed.

BURCH, J., not participating.