William F. NUSSBAUM, Respondent,

v.

KANSAS CITY STOCK YARDS COMPANY
OF MAINE, a Corporation, Appellant.

No. 48702.

Supreme Court of Missouri,

Division No. 1.

April 9, 1962.

Motion for Rehearing or to Transfer to Court
En Banc Denied and Opinion Modified on
Court's Own Motion May 14, 1962.

**336**

John B. Ewing, Jr., James E. Lockwood, Kansas City, for appellant, Brenner, Wimmell, Ewing & Lockwood, Kansas City, of counsel.

Lyman Field, James W. Benjamin, Rogers, Field & Gentry, Kansas City, Ethan Potter, Leavenworth, Kan., for respondent.

HYDE, Judge.

Action for damages for personal injuries, in which plaintiff had a verdict and judgment for $82,106.20, from which defendant has appealed. The injury occurred in Kansas and the decisive question is whether or not the Kansas Workmen's Compensation Law is applicable as plaintiff's only remedy. Defendant contends that the court should have directed a verdict for it for this reason.

Defendant owned and operated stockyards located in Missouri and in Kansas. Its principal office was in Missouri. Plaintiff lived in Kansas and was hired in Missouri as a general utility man to work in defendant's repair and maintenance shop located in Missouri, but sometimes he was sent into the yards in Kansas mainly to operate loading and grading machines and tractors. Defendant had a power plant in Kansas where plaintiff had put up some brackets at one time. He said there were three or four workmen who worked regularly there. Defendant also had a fertilizer factory in Kansas where plaintiff had worked 15 or 20 times with the loading machine. He said from three to five workmen worked regularly there. Defendant had a steel cattle bridge in Kansas over the Kaw River, the main deck of which was used for driving cattle between its yards in Missouri and Kansas. At a higher level, as a part of this bridge, was a catwalk or foot bridge which defendant was taking down. Some of its guard rails were being removed for use in building a hog scale. The first time any steel guard rails were removed was a few days before plaintiff's injury and he had not helped at that time when 17-foot rails were removed. (The wood flooring of the catwalk had been removed previously.) On the day of his injury, plaintiff was told to help an employee (who had assisted in the previous removal) to remove guard rails. On that occasion, when plaintiff was injured, the steel rail being removed (an angle iron with five inches at the top resting on a bracket with three inches below riveted on the side) was 34 feet long and weighed about 400 pounds. When injured, by this rail falling, plaintiff was using an acetylene torch to cut the rivets holding the rail.

Defendant had rejected the Missouri Workmen's Compensation Law and claims plaintiff's only remedy is under the Kansas Act. Plaintiff, after commencing this action, filed "alternatively" a claim for compensation with the Workmen's Compensation Commissioner of Kansas wherein he

set forth that he was pursuing his common-law action against the defendant for damages but "because of the possibility of the running of the statutes of limitations against the claimant under the possible Workmen's Compensation laws of the State of Kansas" he was filing an alternative claim and requesting that the same "be placed on the inactive docket of the Commission pending the outcome of the common-law remedy in the suit in Missouri which claimant has heretofore commenced." Defendant made weekly payments ($35.00) to plaintiff for about eight months and paid hospital and medical bills ($1833.00) and the total of which ($2893.80) was deducted in reaching the amount of the verdict.

The Kansas law, in effect when plaintiff was injured, May 7, 1957, stated (G.S. 44–505, 1955 Supp.) "That this act shall apply only to employment in the course of the employer's trade or business in the following hazardous employments: * * * factory * * * electric, building or engineering work * * * each of which employments is hereby determined to be especially dangerous, in which from the nature, conditions or means of prosecution of the work therein, extraordinary risk to the life and limb of the workmen engaged therein is inherent, necessary, or substantially unavoidable, and as to each of which employments it is deemed necessary to establish a new system of compensation for injuries to workmen." This section also provided: "Agricultural pursuits and employments incident thereto are hereby declared to be non-hazardous and exempt from the provisions of this act."

Sec. 44–508, G.S.1949, provided: "Definitions. In this act, unless the context otherwise requires: * * * (b) 'Factory' means any premises wherein power is used in manufacturing, making, altering, adapting, * * * any * * * articles for the purpose of trade or gain of the business carried on therein, including expressly any * * * electric power plant, and water power plant * * * machine or repair shop, salt plant, and chemical manufacturing plant. * * * (f) 'Building work' means any work in the erection, construction, extension, decoration, alteration, repair or demolition of any building or structural appurtenances. (g) 'Engineering work' means any work in the construction, alteration, extension, repair or demolition of a * * * bridge * * *."

It was also provided by Sec. 44–501, G.S. 1949: "If in any employment to which this act applies, personal injury by accident arising out of and in the course of employment is caused to a workman, his employer shall, subject as hereinafter mentioned, be liable to pay compensation to the workman in accordance with the provisions of this act. Save as herein provided no such employer shall be liable for any injury for which compensation is recoverable under this act * * *."

It was further provided by Sec. 44–507, G.S.1949: "It is hereby determined that the necessity for this law and the reason for its enactment exists only with regard to employers who employ a considerable number of persons. This act, therefore, shall only apply to employers by whom five (5) or more workmen have been employed within the state of Kansas continuously for more than one month at the time of the accident: * * * And provided further, That this act shall apply to mines and building work without regard to the number of workmen employed or the period of time employed." (The one-month requirement was eliminated in 1957, Laws 1957, Ch. 293, Sec. 1; see also 1961 Supp., p. 648.)

The Kansas Supreme Court has said, in Shrout v. Lewis, 147 Kan. 592, 77 P.2d 973, 974: "In order to bring an employer within the act it is not enough that the work at which the laborer is employed is covered by the act, but it is also necessary that the work shall be a part of his employer's trade or business." The Supreme Court of Kansas also has held that "employers in nonhazardous trades or business-

es, that is, those not expressly listed as hazardous under the act, are not subject to its provisions unless they affirmatively elect to operate under it." Thorp v. Victory Cab Co., 172 Kan. 384, 240 P.2d 128, 132. Defendant herein has not elected to do so and has not made any reports of accidents, obtained any insurance, attempted to qualify as a self-insurer or in any way prior to plaintiff's injury recognized any application of the compensation law to it. (It is intimated that it may have considered its main business exempt as employments incident to agriculture.) However, "an employer may have various trades or businesses, some of which are within the act and others which are not," Thorp v. Victory Cab Co., 240 P.2d 1.c. 132, and cases cited.

Nevertheless, as again pointed out in Martin v. Craig, 148 Kan. 882, 84 P.2d 853, G.S. 44–505 makes the act applicable "only to employment in the course of the employer's trade or business" in one of the hazardous employments designated. In that case, the owner of an apartment house with 38 apartments and six dwelling houses, managed by an agent in charge of renting and collecting rentals, was held not under the act as being engaged in "building work" when he had a workman (who was injured) doing shingling work on two of the houses. The court said: "Our question then is whether under the facts and circumstances of this case the business of respondent was that of repairing buildings. In order for this to be the case this court has held that a substantial amount of the time and labor of the respondent must be devoted to it. * * * If we think of the word 'business' in its ordinary and accepted meaning then no one would say respondent was in the building business. The work described occupied too small an amount of his time and attention for this to be possible. If it should be held that this four day's work on these two houses constituted engaging in the building business then every person who owned a building other than his residence

and found it necessary to hire a workman to do some work on it would find that he was subject to the workmen's compensation act. The legislature did not intend such a result." (See also Setter v. Wilson, 140 Kan. 447, 37 P.2d 50.) The court held that the owner's business was renting apartments and houses and collecting rents and not "building work". By contrast in Shrout v. Lewis, supra, a farmer who had actually *built* several houses and apartments which he rented, was held to be in the "building work" business.

The Martin and Setter cases were cited and followed in Giltner v. Stephens, 163 Kan. 37, 180 P.2d 288, 295, 296. In the Giltner case, a farmer was building a large dairy barn on his farm. Plaintiff, a carpenter, sued for damages for his injuries and defendant claimed the Compensation Act applied. The court recognized that the work being done was "building work" but said: "[D]ecision upon the question under consideration must be reached by application of the rule distinguishing between occasional work and the regular work of an employer." The court stated: "It does not appear in the present case from the amended petition that the defendant habitually was giving a substantial part of his time and labor to the construction of barns or other structures. To the contrary, as hereinbefore set forth, the amended petition alleges, in substance, that the regular trade or business of the defendant was the operation of a dairy and stock farm. The petition refers to the building of only one barn and it may be fairly implied that the building of such barn was incident to the ordinary and regular agricultural pursuits of the defendant." See also Campos v. Garden City Co., 166 Kan. 352, 201 P.2d 1017, 1019; Shuck v. Hendershot, 185 Kan. 673, 347 P.2d 362, 368.

■ Defendant's business was not "engineering work", at least so far as this record shows. Its business was operating stockyards for handling and marketing livestock, providing an office building for com-

mission firms, a power house to furnish steam, hot and cold water and a plant to process manure and waste for use as fertilizer. It was not shown to have done any "engineering work" for others or to have engaged in such work as a substantial part of its own business. The only alteration or demolition of a bridge was done on its own bridge, used for driving cattle in its own yards; and so far as the record shows it had only this one bridge. It appears from this record that only on this occasion and one other was any such work done on this bridge and it was only done for the purpose of taking a few rails for use at another place, the footwalk of which they were a part having been abandoned. Applying the principle of Martin v. Craig (84 P.2d l.c. 854) and the other cases cited, we conclude that this work was a minor operation, which occupied too small an amount of time and attention of defendant to say that it was in the business of "engineering work". Since it was only limited occasional work and not the regular work of the employer (applying the test of Giltner v. Stephens, 180 P.2d l.c. 295) "engineering work" was not shown to be part of defendant's trade or business. In fact, this particular work really does not appear to have been done for the purpose of altering or demolishing the bridge but instead was mainly for the purpose of obtaining angle irons for use on another project. Although it might have resulted in some alteration and thus might come within the definition of "engineering work", we must hold the record does not show that "engineering work" was a part of defendant's trade or business. Therefore, we hold that the trial court correctly refused to direct a verdict for defendant.

■ Defendant alleges error in refusing offered Instruction 10 on plaintiff's contributory negligence, saying that if the Workmen's Compensation Act was inapplicable it was entitled to submit this defense. However, defendant was required to submit a correct instruction on contributory negligence and we find Instruction 10 was defective. (Whether it would have been reversible error to give it, we do not need to decide.) In Perkins v. Kansas City Southern Ry. Co., 329 Mo. 1190, 49 S.W.2d 103, 108, concerning submission of a defendant's specifications of contributory negligence of the plaintiff, we said: "These specifications should be submitted in such a way that the jury may determine (1) whether they be true or false, (2) whether they constitute negligence under the surrounding facts and circumstances in evidence, and (3) whether they concurred with the negligence of defendant as a direct, proximate, and efficient cause or causes of the injuries and death complained of." The offered instruction did not require a finding that the specifications submitted constituted negligence and submitted proximate cause in a somewhat indefinite manner.

Moreover, Instruction 10 stated "if the plaintiff knew that the rivets at the west end of the top railing at the time and place mentioned in evidence being dirty and rusty and thereby weak and by reason thereof and after the cutting of the east rivets and center rivets of the top railing, there was danger that said top railing may fall" and the jury found that "notwithstanding said knowledge" plaintiff continued to work "without taking proper safety measures in utilizing ropes to tie the east end of said top railing to secure the same from falling" and found such failure to do so "proximately caused the railing to fall" then plaintiff could not recover. Thus the instruction did not clearly require a finding of plaintiff's knowledge that the rivets at the west end were weak and that "there was danger that said top railing may fall" for that reason but seemed to assume that to be true if those rivets were "dirty and rusty". (Plaintiff said the rivets he cut were good although rusted on top.) Furthermore, this instruction did not properly hypothesize the situation because the evidence did not show that the fall of the railing was caused by the rivets at the west end giving

way or whether they gave way or not. Photographs in evidence (taken soon after plaintiff fell) indicate they did not because this rail apparently remained attached at the west end, after plaintiff was injured, the rail being shown hanging down from its west attachment but unattached at the east end and center. The top rails rested on brackets and plaintiff's evidence tended to show that cattle crossing the bridge while he was working might have caused the detached part to be shaken off the brackets especially since there was also a strong wind blowing. We hold it was not error to refuse this instruction. In its reply brief, defendant complains of the refusal of Instruction 18 also submitting contributory negligence. However, plaintiff made no assignment of error as to refusal of this instruction in its original brief and even in its reply brief only claims from its refusal that the court would not permit the defense of contributory negligence. As to that issue, we note that Instruction 1, the main instruction authorizing a plaintiff's verdict, negatived the defense of contributory negligence and that another instruction referred to it as an issue for the jury to decide.

Defendant also alleges error in permitting witness Benberg, an architect and engineer, to testify that its procedure in removing the railing was unsafe, claiming this was not a proper subject of expert testimony. In answer to a hypothetical question stating the number of men, their height, the equipment they were furnished, the topography and conditions at the bridge, how they were to work and asking "do you have an opinion, from your experience and your training and your knowledge of American building practices and standards, whether or not taking an angle iron down by cutting the rivets at each end where they were positioned as you have told the jury, and then attempting to remove it by ropes, by hand, these two men, have you an opinion whether or not that is a practical and reasonably safe method, according to the practice generally follow-

ed in this area and in the business of erection and demolition, movement of big steel like this?" His answer was: "It is my opinion that it is unpractical and, of course, a highly unsafe procedure." He later stated they should have used a crane and have had the work supervised by a competent supervisor. Defendant's objection at the time did not state the ground now urged. The grounds then stated were that it called for a conclusion by the witness who was no demolition expert; that the conditions as they existed at the time were not described; and that the method testified to by plaintiff was not set forth. All of these grounds have been abandoned and the one now urged has not been properly preserved for review. Nevertheless, it is without merit because it seems reasonable that testimony of a witness familiar with proper and safe methods of moving heavy steel rails from considerable heights was a proper aid to a jury of laymen in passing upon the ultimate fact issue. See Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 245 S.W.2d 96, 103, and cases cited.

Defendant's final assignment is: "The damages awarded were grossly excessive and demonstrate that this verdict was based upon passion and prejudice." Defendant does not seek remittitur, saying "such a drastic remittitur would be required to correct the award of damages as to be conclusive that the award was the result of passion and prejudice." It was stated on oral argument, and not controverted, that defendant did not ask any remittitur in the trial court. Thus defendant's assignment amounts to a claim that the verdict is the result of misconduct of the jury, the only remedy for which would be to set aside the verdict and order a complete new trial. "This Court recognizes a distinction between a verdict which is excessive and a verdict which is so grossly excessive as to indicate bias and prejudice. Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S.W.2d 157, 159; Stokes v. Wabash R. Co., 355 Mo. 602, 197 S.W.2d 304; Taylor v. St. Louis Public Service Co.,

Mo.Sup., 303 S.W.2d 608, 612. A verdict which is excessive is one in which the jury made an honest mistake in weighing the evidence as to the nature and extent of the injury and in fixing the damages and awarded a sum disproportionate to the amounts usually awarded for comparable injuries under the rule of uniformity. Such a mistake can be cured and corrected without a new trial, by requiring a remittitur of a portion of the amount awarded. A verdict which is so grossly excessive as to indicate bias and prejudice is one in which the jury was guilty of misconduct by fixing an excessive figure as a result of bias and prejudice engendered during the course of the trial. Such misbehavior vitiates the entire verdict, not only as to the amount of the award, but also as to the determination of liability, and cannot properly be corrected by a remittitur, Dye v. St. Louis-San Francisco Ry. Co., 361 Mo. 331, 234 S.W.2d 532; Knight v. Swift & Co., Mo.Sup., 338 S.W.2d 795, 801, but requires that the verdict in its entirety be set aside. Stokes v. Wabash R. Co., supra, 197 S.W.2d, l.c. 309, holds that an assignment of error of excessiveness based upon bias and prejudice of the jury will not serve to preserve the question of the simple type of excessiveness first above defined." Skadal v. Brown, Mo.Sup., 351 S.W.2d 684, 689.

■ As also stated in the Skadal case (351 S.W.2d l.c. 690), citing many cases, "this Court has consistently ruled that the mere size of a verdict—the fact that it may be excessive—does not in and of itself establish that it was the result of bias or passion and prejudice, * * * without showing some other error committed in the trial." The reason for this is explained in Jones v. Pennsylvania R. Co., supra (182 S.W.2d l.c. 159), quoting from Sofian v. Douglas, 324 Mo. 258, 23 S.W.2d 126, at page 129: Trial courts "may pass on the weight of the evidence in considering the size of a verdict * * *; whereas appellate courts do not weigh the evidence in reviewing a law case, * * *; and in

view of their better opportunity to measure the general effect of the trial proceedings on the jury, they (trial courts) *may infer prejudice and bias from the size of the verdict alone,* a thing which, as we have seen is held, appellate courts cannot do." Thus the trial court may find *"the verdict was so much against the weight of the evidence as to show bias and prejudice."* (Court's emphasis.) It is not the function of an appellate court to pass on the weight of the evidence in a jury case and that is the reason an appellate court will not make a determination of bias and prejudice of the jury on amount of the verdict alone. Certainly it should not do so when this ground has been presented to the trial court and it has found against this contention.

■ In this case, plaintiff did suffer very severe disabling injuries. He fell 22 feet and landed on large rocks, on the river bank as riprap. His evidence showed brain concussion, with two hours' unconsciousness, partial collapse of the right lung, four pelvic fractures, one extending into the hip joint, with fragmentation and displacement of bones, fracture of the sacrum and compression fracture of the first lumbar vertebrae. Plaintiff also had fractures of the tibia and fibula of his left leg, which has resulted in crooked union, atrophy, loss of motion and shortening of the leg, causing him to walk with a limp, requiring him to use a cane and to wear a built-up shoe; and comminuted fractures of the radius of the left forearm, with nonunion of a fracture at the distal end of the ulna, causing deformity of the wrist, loss of grip and loss of motion of fingers, wrist and shoulder. Plaintiff has headaches and dizziness, attributed to his head injury, pain and loss of motion from his pelvic and back injuries, and likewise pain and loss of motion in his left leg, hip and ankle. Plaintiff, after being in the hospital about two weeks, was allowed to go home in casts; but he was brought back for surgery for placing a steel plate with screws on his leg which required about

another month in the hospital, with later hospitalization when the plate was removed and because of reinjuring his ankle. Plaintiff's medical testimony was that he was 75% permanently disabled and that his injuries render him permanently industrially unemployable. Plaintiff has made a good recovery, considering the extent of his injuries, his pelvic fractures having healed; and defendant had him come back and work in its shop, first on crutches and then with a cane, for a period of more than a year. Plaintiff has since done some farm work and operated tractors but suffers pain in doing so and cannot continue for very long periods. His earning capacity is greatly reduced. Plaintiff was 47 years old at the time of the trial with a life expectancy of 27.15 years; before he was injured his annual earnings had been about $4,000.00. While this is a large verdict and perhaps even some remittitur reasonably might have been ordered upon consideration of the extent of plaintiff's recovery, nevertheless because he is 75% disabled and industrially unemployable we cannot hold that such a verdict indicates misconduct of the jury due to passion and prejudice. This case appears from the record to have been fairly tried and defendant makes no claim of error as to any of the instructions authorizing plaintiff's recovery. We have found defendant's only two claims as to trial errors to be without merit; and the conduct of witnesses, parties and counsel appears from the record to have been orderly and proper, showing no reason for creating bias and prejudice of the jury.

The judgment is affirmed.

All concur.

## On Motion for Rehearing

PER CURIAM.

█ Defendant has filed a motion entitled "Motion to Remand for Retrial in the Furtherance of Justice to Develop Issues Shown by the Opinion to be Material." Defendant says on a retrial it can "show that a regular, constant and substantial portion of its business is 'engineering work'." Thus defendant seeks to have a retrial to permit it to produce evidence which was available to it at the original trial on its defense of applicability of the Kansas Workmen's Compensation Act. It has long been our rule that "No appellate court shall reverse any judgment, unless it believes that error was committed by the trial court against the appellant, materially affecting the merits of the action." Sec. 512.160 RSMo, V.A.M.S., now Rule 83.13(b), V.A.M.R. Defendant's motion and suggestions in support show no error committed against it which prevented it from presenting any such evidence. Therefore, this motion is overruled.

█ Defendant has also filed a Motion for Rehearing or in the Alternative Transfer to the Court en Banc, mainly rearguing matters raised by the original briefs and ruled in the opinion. Defendant has claimed throughout that the applicability of the Kansas Workmen's Compensation Act was for the trial court to rule as a matter of law. Plaintiff contends that this was a defense involving fact issues which had to be submitted to the jury. We agree that it could have been ruled as a matter of law if facts, making it applicable, had been shown by plaintiff's evidence or if defendant had obtained admissions of them (see McKay v. Delico Meat Products Co., 351 Mo. 876, 174 S.W.2d 149, 155); but this was not done. Defendant makes the argument that we should consider, with plaintiff and the man working with him, all its employees engaged in any hazardous work under the Kansas Act although engaged in other work than "engineering work"; but defendant admits there is no Kansas decision so holding. (Defendant relies on Larson on Workmen's Compensation, 773 Sec. 52.33.) In any event, the trouble with this contention is that it was not definitely shown by plaintiff's evidence that defendant had five or more workmen employed in hazardous work "within the State of Kansas continuously for more than

one month at the time of the accident" as required by Sec. 44-507, G.S.1949. It is true that defendant had evidence to so show but as plaintiff points out the credibility of such evidence was for the jury to determine. (See Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119, 121, 122.) Therefore, if defendant desired to rely on the defense of the applicability of the Kansas Act, it should have submitted the fact issues on which it depended. Defendant says it was misled by the position plaintiff took concerning the effect of the Missouri Workmen's Compensation and its rejection by defendant. However, regardless of any position taken by plaintiff, defendant had the responsibility to show facts which made the Kansas Act applicable (unless they appeared from plaintiff's evidence or were admitted) and to submit the issue by a proper instruction.

As to the other matters raised in this motion, we reaffirm the rulings made in our opinion.

The motion for rehearing or to transfer to Banc is overruled.