Janet ALLEN, Plaintiff-Respondent,

v.

BI–STATE DEVELOPMENT AGENCY, a
corporation, and Milton Novasak,
Defendants-Appellants.

No. 33533.

St. Louis Court of Appeals,
Missouri.

Feb. 24, 1970.

Paul B. Hunker, Jr., St. Louis, for appellants.

Kroening & Kelly, Gordon F. Webb, Clayton, for respondent.

WEIER, Commissioner.

Plaintiff, Janet Allen, filed suit for personal injuries which she sustained while riding as a passenger in an automobile driven by her husband, Eugene Allen. Her suit was directed against defendant, Milton Novasak, and his employer, Bi-State Development Agency, the owner of the automobile he was driving. The case was submitted to the jury on the negligence of Novasak in failing to keep a careful lookout. The jury rendered verdict against both defendants for $3,500.00. After plaintiff accepted a remittitur of $1,500.00, judgment was entered in the sum of $2,000.00.

Defendants first complain of the action of the trial court in overruling their motion for directed verdict at the close of all the evidence for the reason that there was no substantial evidence that defendant Novasak could have avoided the accident. Since this goes directly to the essential facts of the collision as they bear on liability, we will relate those that are most favorable to plaintiff and which may sustain the verdict.

The collision occurred at the intersection of Pattison and Kingshighway in the City of St. Louis. The car in which plaintiff, Mrs. Allen, was riding was traveling east on Pattison. Pattison enters Kingshighway from the west to form a T-type intersection. It has two traffic lanes, one east and one westbound. Traffic entering Kingshighway is controlled by a stop sign. Defendant Novasak was driving south on Kingshighway. Kingshighway at this point has three traffic lanes south and three traffic lanes northbound. A short distance south of the Pattison intersection, estimated at about 50 to 60 feet, Shaw Avenue enters Kingshighway from the west and traffic is there governed by an electric signal. The intersection and street topography in this area is generally level.

On September 30, 1966, at the time of the collision the weather was misty and the pavement was wet, but visibility was not impaired within the distances involved. It was daylight. Mr. Allen was driving east on Pattison with his wife sitting in the right front seat with their two-year-old son on her lap. Allen stopped at the stop sign on Pattison. Southbound traffic was passing on Kingshighway. He intended to turn left. Looking south, he noticed the traffic signal at Shaw was red and cars had filled the traffic lanes to Pattison. Cars in the curb and center southbound lanes of Kingshighway had stopped north of Pattison and the drivers of the two front vehicles motioned Allen to come ahead. About three cars occupied the curb lane to the north. Two cars were in the middle southbound lane. Car lengths were estimated to be 18 to 20 feet. No cars were in the lane next to the center line. Allen was in his right lane and proceeded out into Kingshighway to the middle south-

bound lane and stopped. He could see about 50 feet north in the inside lane which was next to the center line. He had a clear view with no obstruction. He looked to the south and determined there was no northbound traffic. He again looked north, saw no vehicles approaching and started forward. Suddenly he saw a flash and the collision occurred in the third or inside southbound lane.

Mr. Novasak was on company business. He had entered Kingshighway several blocks north and was proceeding south. His speed on Kingshighway never exceeded 15 miles per hour. When he was a hundred feet north of the Pattison intersection he had already slowed to 5 miles per hour and never accelerated. When he was 50 feet north of the intersection he had his foot on the brake and was slowing. He was seen driving in the middle lane until he neared the two vehicles stopped north of Pattison. He then pulled into the inside or third lane and drove there until the collision occurred. At no time did he see the Allen car up to the time of collision but he acknowledged that he did notice the gap left by the stopped vehicles north of the Pattison intersection when he was about one car length away.

Impact occurred to the front of the Allen car. On the Bi-State car, it ranged from the right front headlight back to the right door of the two-door vehicle.

■ Passing now to defendants' first contention, we must hold that, based upon the facts which the jury could have found and inferred, plaintiff made her case on failure to maintain a careful lookout. Although each case must be decided upon the unique facts which it presents, it should be observed that even though Novasak was on a street without any traffic controls at the collision intersection, and Allen's forward movement was governed by a stop sign, Novasak was not entitled to drive blindly into the intersection. It is always the duty of a motorist entering an intersection to maintain a careful lookout. Even a green

light does not relieve him of this duty, nor does it confer upon him an absolute right to proceed across the intersection and disregard the movement of other traffic. Gerdel v. Broccard, Mo., 428 S.W.2d 492, 495[2–6].

■ It is necessary of course that in order to make a submissible case of failure to maintain a lookout, substantial evidence must be produced showing that the defendant driver, in the exercise of the highest degree of care, could and should have seen the other vehicle and realized the danger of collision in time thereafter to have taken available and effective precautionary action. Ochs v. Wilson, Mo.App., 427 S.W.2d 748, 751[2]; Zalle v. Underwood, Mo., 372 S.W.2d 98, 102[3].

In the instant case when Novasak was a hundred feet north of the intersection he had already slowed to 5 miles per hour and never accelerated. His travel time at that speed was 7⅓ feet per second. He had his foot on the brake when he was 50 feet north of the intersection. Reaction time is judicially recognized to be three-fourths of a second. Schneider v. Dannegger, Mo. App., 435 S.W.2d 416, 419[4]. Certainly Novasak could have been expected to respond to sensory warning in that time with his foot already on the brake. Traveling at 5 miles per hour he could have been expected to stop his automobile within a very few feet or as expressed in Richardson v. Wendel, Mo., 401 S.W.2d 455, 459[5], "practically instantly * * * and certainly within 25 feet." If Allen could see 50 feet up the inside lane, surely when Novasak changed lanes north of the two stopped cars in the middle lane, the jury could infer that he could see down the lane 50 feet. As he got closer to the gap in the traffic at the mouth of Pattison, the jury could infer that he could see the Allen automobile at a distance of at least 25 feet if he had been keeping a careful lookout. The jury could further come to the conclusion based on these facts that he had time and distance to have stopped or have swerv-

ed to the left, since there was no northbound traffic.

The facts here are not the same as those in Zalle v. Underwood, supra, another case where an automobile was struck while going through a gap in a line of stopped automobiles and submission of failure to maintain a lookout was disapproved. In Zalle there was no showing where the driver charged with failing to maintain a lookout was located when he reasonably could be held to have anticipated the other driver would operate through the gap. Furthermore, he was coming at a speed of 30 to 40 miles per hour 200 feet from point of impact and was still traveling 25 to 30 miles per hour at impact.

■ Certainly in the case at bar whether Novasak failed to see what he should have seen was a question to be decided by the jury. Coulter v. Bi-State Development Agency, Mo.App., 434 S.W.2d 793, 796[6] And it was also within the province of the jury to determine that he could have affirmatively and efficaciously acted to avoid the collision, considering the distance at which he could have seen the Allen automobile and the speed he was traveling.

■ The evidence was sufficient to submit plaintiff's case to the jury on the negligence of Novasak in failing to maintain a careful lookout. In view of this ruling it is not necessary to take up the other grounds of negligence alleged in plaintiff's petition nor discuss the evidence which might sustain them.

■ Defendants' point that the trial court committed error in submitting a verdict-directing instruction based upon failure to maintain a careful lookout must also be overruled. This attack is not based upon the form of the instruction (MAI 17.05), but rather because there was not substantial evidence to support such a finding. We have already answered this in deciding the evidence to be sufficient to submit the case on failure to maintain a lookout.

■ Error prejudicial to defendants is claimed on this appeal because of argument made by plaintiff's counsel in rebuttal to defendants' argument. That portion criticized and objected to in the trial court is as follows:

"MR. WEBB: Now, how in the world can Mr. Hunker or anybody else say that he was keeping a careful lookout? What scintilla of evidence was there that he was looking? He says there are cars stopped here for Pattison. I know there are cars stopped here for Pattison and I know there are cars stopped there for Shaw, but I am not going to even bother looking in that—

"MR. HUNKER: Your Honor, I am going to object to that; that's completely against the evidence.

"THE COURT: Your objection is overruled. You made an argument, now Mr. Webb makes his argument. The jury will determine whether it's against the evidence or not."

Counsel for defendant says that by overruling his objection to such argument the trial court was in fact stating that there was evidence to the effect that Novasak testified to not keeping a lookout.

During direct examination Mr. Novasak said he did not see the Allen vehicle before the collision. Later he said he never saw the gap in the line of traffic until he was about a car length away and he then sounded a horn. From this and other circumstances we believe plaintiff's counsel had a right to present in this argument, as an inference from the facts, his version of the thoughts and mental processes Mr. Novasak might have been engaged in at the time he was driving toward the intersection. Obviously Novasak did not say this but he might have been thinking it.

■ Courts allow counsel a wide latitude in final argument in discussing facts

and arguing inferences from the evidence even though the inferences drawn are illogical or erroneous. The trial court overruled the objection. It was vested with a large discretion in ruling on the propriety of jury arguments and in determining the prejudicial effect of arguments. Unless clearly abused, the exercise of such discretion will not be disturbed. Eddings v. Keller, Mo., 400 S.W.2d 164, 170[6]. The court's ruling was proper here and will not be disturbed.

Lastly, defendants complain of the excessiveness of the verdict by saying that it was so grossly excessive as to be conclusive proof of the fact that it was the result of passion and prejudice and the defendants are entitled to a new trial or an additional remittitur should be ordered. No authorities are urged in support of this proposition.

The first portion of this contention is actually a claim that the verdict is the result of misconduct by the jury. What has been so well said in McConnell v. Pic-Walsh Freight Co., Mo., 432 S.W.2d 292, 301[18–20] disposes of this issue:

"* * * Misconduct of this gravity, when found, vitiates a verdict in its entirety, cannot be corrected by remittitur, and requires that the verdict be set aside and a new trial be awarded not only on the question of damages but also on the question of liability. Skadal v. Brown, Mo.Sup., 351 S.W.2d 684[14]; Nussbaum v. Kansas City Stock Yards Co. of Maine, Mo.Sup., 359 S.W.2d 335[4]. The mere size of a verdict, however, is not sufficient in and of itself to establish that the verdict was the result of misconduct, bias or prejudice. There must have been some incident or occurrence at the trial, or error committed, of such a nature as to engender bias, passion or prejudice. Skadal, Nussbaum, supra, and authorities cited. Trial courts may pass on the weight of the evidence·in considering the size of the verdict but it is not the function of appellate courts to weigh the evidence in reviewing a jury case. 'Certainly it should not do so when [as here] this ground has been presented to the trial court and it has found against this contention.' (Our brackets.) Nussbaum, supra, 359 S.W.2d l. c. 341[6]."

■ No incident or occurrence at the trial has been pointed out nor do we find any that would justify a finding of misconduct. The trial court has passed on this matter. It could have granted a new trial because of a finding of bias, passion and prejudice based on the size of the verdict alone. But having refused to make such a finding, we will not now weigh the evidence and make such a finding based only upon excessiveness.

The second portion of the complaint on gross excessiveness of the verdict requests, as alternative relief, that an additional remittitur be ordered. The trial court had previously ordered a remittitur of $1,500.00 to bring the verdict from $3,500.00 down to $2,000.00. This was accepted by the plaintiff and judgment entered on the reduced amount.

The evidence showed that Mrs. Janet Allen was thrown forward in the car at time of collision striking her chin on the dashboard. She said she was then "flung" back. She was taken to Barnes Hospital for emergency treatment. X-rays were taken which revealed no fracture. She had no cuts and was released. She was experiencing pain in the left side of her jaw and down the left side of her neck. She then went to see a doctor who prescribed medication and a collar or supportive device on her neck. This she wore during waking hours about six weeks. She could hardly talk or eat. After going to the initial treating doctor about three times she was referred by him to another doctor who gave her shots below her ear on the left side. The pain continued constantly for about six months. It was an aching with pains shooting out in her neck. She could not move her head during this time. A year after the injury she would have pain when suddenly turning her head. At

time of trial over two years after the injury she would notice pain on lifting heavy objects or sudden strain.

The treating physician found a wrenching of the muscles of the neck. · No claim was made that the injury was permanent or that it left any permanent impairment or disability.

On appeal, we can act only when excessiveness appears as a matter of law. Normally the jury is the final arbiter and we can order remittitur only when the verdict is clearly for an amount in excess of the very most that the proof of damages could reasonably sustain, and then only when the judgment is so excessive as to shock the conscience of the court. (See Alfultis v. Bi-State Development Agency, Mo.App., 439 S.W.2d 206, 210[7]; Pulem v. George, Mo.App., 433 S.W.2d 83, 86[4–7]. Here the trial court has already reduced the verdict to $2,000.00. We do not find this amount excessive.

The judgment below is affirmed.

PER CURIAM.

The foregoing opinion by WEIER, C., is adopted as the opinion of this Court. Accordingly, the judgment below is affirmed.

WOLFE, P. J., and ˙BRADY and DOWD, JJ., concur.